**STATE of Iowa, Appellee,**

v.

**Lon Michael CASLAVKA, Appellant.**

No. 93–1201.

Supreme Court of Iowa.

April 26, 1995.

Linda Del Gallo, State Appellate Defender, and Kevin Cmelik, Asst. Appellate Defender, for appellant.

Thomas J. Miller, Atty. Gen., Julie H. Brown, Asst. Atty. Gen., Brent D. Heeren, County Atty., and Richard Vander Mey, Asst. County Atty., for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, LAVORATO, and SNELL, JJ.

CARTER, Justice.

Defendant, Lon Michael Caslavka, appeals from the judgment and sentence entered upon his conviction, following jury trial, of theft by misappropriation in the first degree in violation of Iowa Code section 714.1(2) (1991). He urges that the district court erred in denying his motion for judgment of acquittal because he did not appropriate the property of another or property held in trust. Upon reviewing the record and considering the arguments presented, we agree with that contention and reverse the judgment of the district court.

Defendant owned and operated Cas Feed Store in Traer, Iowa. Although there is some indication in the record that Cas Feed Store may at one time have been incorporated, the transactions involved in the present proceedings were carried out by Lon Caslavka d/b/a Cas Feed Store. It had long been the practice of this business to accept prepayments from farmers to purchase products to be delivered at a later date. In the fall of 1991 and the winter of 1991–92, Caslavka accepted prepayments of approximately $320,500 from twenty-three area farmers for various agricultural products.

The advances received from farmers in the fall or winter of 1991 were for purposes of securing the delivery of chemicals the following spring. All of the prepaying buyers experienced difficulty in obtaining their products when demanded. Ultimately, Lon Caslavka d/b/a Cas Feed Store became insolvent. As a result, these twenty-three farmers collectively sustained losses of approximately $180,000 because they did not receive all of the agricultural supplies that had been ordered.

Cas Feed Store maintained both a checking account and a savings account at the Farmer's Savings Bank in Traer. In addition, defendant maintained two personal checking accounts and one personal savings account. Approximately $308,500 received from farmers as prepayment for agricultural products was deposited in the Cas Feed

Store savings account. Thereafter, on March 16, 1993, the Farmer's Savings Bank exercised a right of setoff against all of the funds in the Cas Feed Store savings account, which at that time totaled $128,000. This action was taken as the result of defendant's default on business loans that the bank had made for the operation of the feed business.

The setoff against the bank account was followed up by a joint effort of the bank and defendant to sell the business. When that proved unsuccessful, the bank initiated foreclosure proceedings against other assets of the business that were collateral for its loans. The defendant continued to operate the business until sometime around July 1, 1992. During this time, he received an additional $12,000 as prepayment for farm chemicals that were never delivered to the buyers. A receivership for the business was ultimately established, and the business was leased to a cooperative.

The trial information in this case originally charged defendant with both theft by misrepresentation and theft by misappropriation. By the time of trial, however, only a theory of theft by misappropriation was relied on by the State. It was a basic premise of this theory that the defendant held, as a trustee, the monies that the farmers had prepaid. It was the contention of the State that, prior to funds being removed from the Cas Feed Store savings account by the bank, defendant also had removed substantial funds from that account and applied them to personal uses, including vacations, commodities trading losses, and gambling debts. The State offered evidence that tended to establish the latter contention in whole or in part.

At the conclusion of the State's evidence, and again at the conclusion of all of the evidence, defendant moved for a judgment of acquittal. That motion contended that, although the farmers' prepayment created a contractual agreement wherein defendant was liable to perform the contract, the monies received pursuant to that contract became defendant's funds to treat as he saw fit. The motion specifically asserted that no trust relationship was created with respect to the prepaid funds. The district court denied the motion for judgment of acquittal.

At the conclusion of the evidence, the district court instructed the jury as follows with respect to the elements of the offense:

## INSTRUCTION NO. 13

The State must prove both of the following elements of Theft:

1. The Defendant had possession of monies by reason of a trust as explained in Instruction No. 14.
2. That from November 6, 1991, through and including April 21, 1992, the Defendant intentionally misappropriated the money by using it in a manner which was inconsistent with or a denial of the trust.

If the State has proved both of the elements, the Defendant is guilty.... If the State has failed to prove either of the elements, the Defendant is not guilty.

## INSTRUCTION NO. 14

Concerning element number 1 of Instruction No. 13, a person has property in his "trust" when it is given to him by the owner or a third person to be held in safekeeping. This creates a special relationship with respect to the property, and the person who receives the property is known as a "trustee".

In this case, it is alleged the duties of the Defendant were to buy fertilizer and chemicals for the farmers who had prepaid for such items, and the Defendant violated those duties by misappropriating the property.

The jury found defendant guilty of misappropriating funds of a value exceeding $10,000. Other facts that are related to this appeal will be set forth in the discussion of the legal issues that are presented.

I. *Whether the State's Evidence Will Sustain the Creation of a Trust With Respect to the Sums Prepaid to Defendant for Delivery of Agricultural Supplies.*

The primary thrust of defendant's appeal is a contention that the State's evidence was insufficient as a matter of law to permit a trier of fact to find that a trust arrangement existed with respect to the funds that had been prepaid for future delivery of agricul-

tural products. The elements of the crime with which defendant was charged are set forth in the following statute:

A person commits theft when the person does any of the following:

. . . .

2. Misappropriates property which the person has in trust, or property of another which the person has in the person's possession or control, whether such possession or control is lawful or unlawful, by using or disposing of it in a manner which is inconsistent with or a denial of the trust or the owner's rights in such property, or conceals found property, or appropriates such property to the person's own use, when the owner of such property is known to the person.

Iowa Code § 714.1(2) (1991). The State's theory of prosecution was based on the "property which the person has in trust" language as were the trial court's instructions to the jury.

In *State v. Galbreath*, 525 N.W.2d 424 (Iowa 1994), we considered the "property of another" language contained in section 714.1(2) and concluded that "a down payment made pursuant to the terms of a construction contract is not held by the contractor as 'property of another,'" *Id.* at 426. Although the opinion focused primarily on the "property of another" language, it also discussed trust principles. We rejected, in *Galbreath*, the conclusion of a Washington appellate court in *State v. Joy*, 121 Wash.2d 333, 851 P.2d 654 (1993), that, if a contract suggests that funds tendered by a buyer will be used to purchase specifically described materials, it is a breach of a trust to use the funds for other purposes. We concluded that "while perhaps satisfying, [the outcome in *Joy*] can only be reached through a legal fiction of converting an unconditional transfer to a transfer in trust." *Galbreath*, 525 N.W.2d at 426.

In the present case, the State attempted to establish a trust predicated on the fact that the monies were tendered to the defendant to secure a performance that required him to purchase specific products on the customers'

behalf. Our review of the record does not support the claim that defendant purchased or agreed to purchase agricultural products as the customers' agent. The defendant purchased or agreed to purchase these products in his own name and resell them to his customers for a profit. The situation is thus similar to that before the Washington appellate court in *Joy*. In rejecting the *Joy* court's rationale in our *Galbreath* decision, we suggested that this type of transaction gives rise to a contractual relationship rather than a trust relationship.

Both the State and the defendant rely on language in Black's Law Dictionary 1352 (5th ed. 1979) defining the terms "trust" or "in trust" as "[a] fiduciary relation with respect to property, subjecting person by whom the property is held to equitable duties to deal with the property for the benefit of another person *which arises as the result of a manifestation of an intention to create it.*" (Emphasis added.) [1] The parties quarrel, however, over the formalities required to create a trust meeting this definition. Even if we accept the State's contention that no specific formality is required, we cannot ignore the requirement that there be some objective manifestation of an intention to create the relationship as defined in the quoted definition.

The Restatement (Second) of the Law of Trusts sets out the methods of creating a trust. Only two of these methods are relevant to the present dispute. These are: (a) a declaration by the owner of property that he holds it as trustee for another; and (b) a transfer inter vivos by the owner of property to another person as trustee for the transferor or for a third person. Restatement (Second) of Trusts § 17 (1959) [hereinafter Restatement]. The first of these two methods, by its very definition, requires a declaration by the purported trustee that this person accepts the trust. The second method requires some manifestation of the purported settlor's intent that the purported trustee is to accept the res subject to the conditions of the trust. The defendant urges that the

---

1. A similar definition of the term "trust" is found in *Hanson v. Birmingham*, 92 F.Supp. 33, 40 (N.D.Iowa 1950), *appeal dismissed*, 190 F.2d 206 (8th Cir.1951).

required manifestation of a trust is lacking under either of these methods. We agree.

■ Except in those instances in which the legislature itself has declared a trust relationship on the part of a merchant such as is the case with prepayment of funeral expenses, *see State v. Ludvigson,* 482 N.W.2d 419 (Iowa 1992) (interpreting Iowa Code § 523A.1), or disposal by a partner of partnership assets, *see State v. Sylvester,* 516 N.W.2d 845 (Iowa 1994) (interpreting Iowa Code § 486.21), we do not believe that a trust agreement may be inferred in the absence of some proof of the requisite manifestation of intention.[2]

The evidence offered by the State in its effort to show the existence of a trust relationship was based entirely on the assumptions entered into by defendant's customers. Typical of this evidence is the testimony of three witnesses for the State. Dennis Berger testified on direct examination:

> Q. When you gave Mr. Caslavka the money, these different checks totaling $44,000, what did you think would be done with what you had paid him? A. Either it goes into a special account or he deals right with the distributor of that product to get the cheaper price.

David Brezina testified on direct examination:

> Q. Mr. Brezina, when you gave Cas Feed that check, what did you think would be done with the money? A. I figured Lon would deposit it into his bank account to be used to purchase chemicals and fertilizer.
>
> Q. Did you expect that your pre-pay amount would actually be used to get you the product or supplies that you had paid for? A. Yes.

Calvin Dostal testified on direct examination:

> Q. When you gave the money to Mr. Caslavka, those three checks that have been received into evidence, what was your expectation as to what would be done with the money? A. The chemicals and fertilizer would be purchased at that time and

more or less set aside for us to use in the spring.

> . . . .
>
> Q. Let me ask you this: Did you expect that the money that you gave to Mr. Caslavka would be used for the purposes that you had agreed upon? A. Yes.
>
> Q. Did you expect that the money that you paid to Mr. Caslavka would be used for the supplies as indicated on the invoices? A. Yes.
>
> Q. Did you expect that the money that you had used to pre-pay would be used for other purposes? A. No.

■ None of the three witnesses whose testimony we have quoted or the other twenty farmers who testified against the defendant made any claim that defendant assured them at the inception of these transactions that their money would be held in trust for use in purchasing the designated products on their behalf. Nor did any of these witnesses claim that they manifested an intention to impose such duties on defendant when the funds were delivered. Indeed, there is no claim in the testimony of these witnesses that the subject was even discussed. We have independently searched the record and can find no objective manifestation of intent to create a trust. Absent some manifestation of that intention by either defendant or his customers, it is not a reasonable assumption within the commercial realities of the transaction that a duty would be imposed on him to deal with the funds as a trustee. As one court has observed, "the establishment of a fiduciary relationship requires that the relationship of the parties must exhibit the characteristics of a traditional trust relationship and that the fiduciary duties exist before the act of wrongdoing and not as a result of it." *In re Pedrazzini,* 644 F.2d 756, 758 (9th Cir.1981).

The State seeks to obviate the absence of commitment by defendant to establishing a trust account by pointing to the testimony of certain of these witnesses that defendant, in conversation, indicated that he had placed

---

**2.** A trust may be created by statute without a manifestation of intention by the settlor or trust-

ee. Restatement § 23 cmt. c.

their payments in a "special account." Typical of this testimony is that of the witness Kenneth Strohbehn, who testified as follows:

Q. When you found the—In light of what you'd been told when you tried to pick up your product and in light of what you found in the warehouse, what did you do next? A. I asked Lon when we were going to get the product or where it was.

Q. What did he tell you? A. He said the bank took his money so go see the bank.

. . . .

Q. And after that then, did you go back to the—Cas Feed? A. Yes.

Q. And what happened then? A. Well, Lon said he had taken our money that we paid for these products and he put it in a special account, and Lon told us that the bank took that account so he couldn't buy the product unless the bank gave him back the money.

■ This testimony and that of the other witnesses who stated that defendant had mentioned a "special account" involved conversations that took place long after they had paid their money to defendant. These conversations occurred when defendant was being pressed for delivery of the product in the spring. There is nothing in the record to suggest that defendant's mention of a "special account" had any meaning other than the savings account of the Cas Feed Store business. Except for two transactions that occurred subsequent to the seizure of that account by the bank, defendant had placed the farmers' monies in this account. The problem was that he did not leave it there. As we have previously indicated, however, whatever meaning may be attributed to the term "special account," the act of segregating money in a special account does not create a trust absent the requisite manifestation of intention.

As a final effort to avoid the inadequacies in its proof, the State contends that defendant admitted that he had a duty not to use the farmers' money for purposes other than buying the product. We find this claim to be based on testimony taken out of context. Immediately following the testimony of defendant on which the State relies, he stated:

Q. Would you agree that you had a duty towards the farmers to use their prepay funds in such a way as to ensure they received what they paid for? ... A. I worked for them basically, yes. I was there to fill their needs.

Q. That was their money; wasn't it? A. What money?

Q. The pre-pay money? A. Money that went into our account, again, it was a general account. We disbursed it as we felt was fit.

We conclude that defendant's position has at all times been that he was free to place this money in a general account and disburse it as he saw fit.

II. *State's Claim That Defendant Conceded the Existence of a Trust Relationship by Proposing Jury Instructions Pertaining to Defendant's Duties as a Trustee.*

■ The State contends that the defendant conceded the existence of a trust relationship by proposing jury instructions concerning his duty as a trustee. We find no merit in this claim. This court has taken the position with respect to past similar claims that, once a motion for directed verdict has been overruled by the trial court, any error in that ruling is not waived by the moving party offering jury instructions that are inconsistent with the position taken in the denied motion. *Kinney v. Larsen,* 239 Iowa 494, 496, 31 N.W.2d 635, 636 (1948); *Heavilin v. Wendell,* 214 Iowa 844, 849, 241 N.W. 654, 657 (1932).

In the *Heavilin* case, we stated the reason for this rule in the following terms:

By submitting the motion and having an adverse ruling, defendants did not waive their right to have the case submitted to the jury, under proper instructions. They did not waive any error committed by the court in its ruling upon the motion for a directed verdict. They had no other recourse. They were forced by the action of the court in overruling the motion to make at least some effort to protect themselves

against further evil consequences at the hands of the jury.

214 Iowa at 851, 241 N.W. at 657.

We have considered all issues presented and conclude that defendant's motion for judgment of acquittal should have been sustained by the district court. The judgment is reversed and the matter remanded to that court for entry of a judgment of acquittal.

**REVERSED.**